IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

CHRISTOPHER MASTERS, §
(BOP #04336-063) §
VS. § CIVIL ACTION NO.4:06-CV-502-Y
 §
UNITED STATES OF AMERICA, et al.§

OPINION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

In this case, inmate/plaintiff Christopher Masters has claims remaining against individual defendant Dr. L. Huber and against the United States of America ("USA").[1] Each of those defendants has now filed a motion for summary judgment, along with a brief in support and an appendix. Masters has filed a response to Huber's motion, to which Huber filed a reply. Masters did not timely file a response to the USA's motion within the extended time provided by this Court, but on July 31, 2008, he sought an additional extension on the basis of institution mail and copying issues, and a response was then filed on August 1. In the interests of justice, the Court will grant the motion for extension and deem Masters's response to the USA's summary judgment motion timely filed.

By his motion for summary judgment, Huber asserts a qualified-immunity defense to Maters's claim that he was deliberately indifferent to Masters's serious medical needs in his treatment of a chronic migraine-headache condition. The USA contends that

---

[1] The Court previously dismissed, under authority of 28 U.S.C. §§ 1915A and 1915(e)(2)(B), Masters's claim for a preliminary injunction, and his claims against several other individual defendants.

Masters has not presented sufficient evidence to establish a claim against it under the Federal Tort Claims Act ("FTCA"). For the reasons set forth below, the Court concludes that each motion for summary judgment must be granted.

*Summary-Judgment Evidence*

The appendices submitted by Huber in support of his motion for summary judgment include the September 24, 2007, Declaration of Paul Irby, along with 54 pages of Masters's Bureau of Prisons (BOP) records (Appendix 1, attachments 3-57); Huber's own January 10, 2008, Declaration (Appendix 2, attachments 58-59); and the January 10, 2008, Declaration of Arden Hanson (Appendix 3, attachments 60-61). Masters did not submit any declarations or documents with his response to Huber's motion. In support of its motion for summary judgment, the USA submitted as appendices the June 9, 2008, Declaration of Paul Irby, along with two pages of medical records (Appendix 4, attachments 62-65 ); and two copies of court cases (Appendix 5 and 6). Although Masters attached copies of medical records to his response, he has not accompanied such records with an affidavit or declaration to support their consideration by the Court.[2] Thus, such papers will not be considered in resolving the summary-judgment motions. As Masters expressly declared that both his complaint and his more definite statement were true and correct

---

[2] Furthermore, the medical records are all from 1996-1998, long before Masters's claims that he has made the basis of this case.

under penalty of perjury, this Court is required to consider those document as competent summary-judgment evidence.[3]

*Summary-Judgment Standard*

Summary judgment is appropriate when the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[4] The party moving for summary judgment has the initial burden of informing the Court of the basis for his motion and producing evidence that tends to show that no genuine issue as to any material fact exists and that he is entitled to judgment as a matter of law.[5] Once the moving party has made such a showing, the non-moving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial.[6] Whether an issue is "genuine" is a determination of whether it is "real and substantial, as opposed to merely formal, pretended, or a sham."[7]

---

[3] *See Nissho-Iwai American Corp. v. Kline,* 845 F.2d 1300, 1306 (5th Cir. 1989). Masters's "response" to the defendants' answer, construed as a reply, was not sworn to under penalty of perjury, so it is not considered as evidence.

[4] FED. R. CIV. P. 56(c).

[5] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986).

[6] *Id.*, at 322-23; *Anderson,* 477 U.S. at 257.

[7] *Bazan ex rel. Bazan v. Hidalgo County,* 246 F.3d 481, 489 (5th Cir. 2001)(noting that only genuine and substantial issues may subject a defendant to the burden of trial in qualified immunity context)(quoting *Wilkinson v. Powell,* 149 F.2d 335, 337 (5th Cir. 1945).

A fact is "material" if its resolution in favor of one party might affect the outcome of the action under governing law.[8] No genuine issue of material fact exists if no rational trier of fact could find for the nonmoving party based on the evidence presented.[9] The Court must consider all evidence in the light most favorable to the nonmoving party.[10]

*Facts*

The defendants have recited facts in each of their motions, and Masters has responded by either agreeing to the recitations or contesting elements of each. The Court will review the material facts in the light most favorable to Masters.

Bureau of Prisons records indicate that Masters arrived at FCI--Fort Worth on April 7, 2005, with a self-reported history of headaches, seizures, loss of memory, and nervousness, for which he was taking the medication Paxil. Masters also reported a history of drug use, including methamphetamine and marijuana. (Appendix 1("App. 1"), at 3-6.) Defendant Dr. Huber did not become involved in Masters's care and treatment until September 20, 2005. (App. 1, 25; Huber Decl., 58.) In the time between his arrival and care by Dr. Huber, Masters was seen by staff or contract physicians, or had

---

[8]*See Anderson,* 477 U.S. at 248.

[9]*See National Ass'n of Gov't Employees v. City Pub. Serv. Bd.,* 40 F.3d 698, 712-13 (5th Cir. 1994).

[10]*See Id.* at 713.

4

diagnostic procedures on April 11, April 19, April 20, May 13, June 22, July 7, July 8, August 23, August 30, September 2, September 15, and September 16. Masters was seen by staff physician Dr. J. McLaughlin, a consulting psychiatrist; a consulting neurologist, Dr. Orr; and a staff physician, Dr. Barry. In an effort to treat his headaches, Masters was prescribed, at different times, Imitrex, Elavil, Paxil, Toradol with Reglan, Indomethacin, and Keppra. The contract psychiatrist gave a provisional diagnosis of mood and psychotic disorder, but also recommended that Master be "medically unassigned [due] to his unstable condition." (App. 1, 14.)

When Masters began taking Toradol, he was advised by pharmacist Arden Hanson that it could cause internal bleeding. (Masters's Response at 5.) An MRI of Masters's brain was performed on August 23, 2005, and although the resulting report noted the presence of "three or four tiny white matter signal abnormalities . . . [which] could be related to demyelinating process such as multiple sclerosis," the records do not otherwise indicate any such disease, and the consulting neurologist, who noted the MRI in his August 30, 2005, note, did not link the impressions from the MRI to Masters's headaches. (App. 1, 19-20.)

On September 20, 2005, Huber took over as Masters's primary care physician and recorded a note that briefly detailed Masters's current diagnosis. (Huber Decl. 58.) On September 21, 2005, the contract psychiatrist evaluated Masters and recommended maintaining

5

Masters's dosage level of Paxil, and that psychology staff teach Masters pain management techniques. (App. 1, 27.) On October 24, 2005, Huber conducted an extensive examination of Masters following Masters's visit to a hospital for chest pain and headaches, and made extensive notes of Masters's medical history and current medications.(App. 1, 28-31.) Apparently deciding not to follow the neurologist's recommendation, Huber noted that there was "no reason not to work, pending [follow-up] with neuro."(App. 1, 31.) He also recommended that Masters try Tylenol, as well as Zantac for gastrointestinal complaints, and he recommended that Masters continue to be monitored by the psychiatric team. (App. 1, 29,31.)

Consulting neurologist Orr evaluated Masters again on November 8, 2005, and his notes from that consult indicate: Masters's complaints that Tylenol alone did not control his headaches; Masters's list of medications included Elavil, Keppra, Paxil, Zantac, and Toradol; the MRI results were stable; Masters was not able to tolerate anti-steroidal anti-inflammatory drugs; and Masters's history of depression and anxiety. (App. 1, 34-35.) Orr opined that Masters "may still benefit from Toradol" for severe headaches, but that his gastrointestinal condition would need to be monitored. In addition, Orr recommended that staff consider "hydrocodone, Tylenol or percocet to be given as needed, limited to two to three days a week." (App. 1, 35.)

Masters was then seen by Huber on December 13, 2005, and Huber entered an extensive note documenting Masters's history and a treatment plan. (App.1,37-38.) Huber noted Masters's acknowledgment that he had complained of headaches since 1988, and been seen by multiple doctors without resolution, such that Huber noted the "best that could be done is to treat the very bad headaches." (App. 1, 36.) Huber noted that Masters reported that Toradol was effective, but he would be limited to two injections per week, and that Tylenol would be continued for the moderate headaches. (App. 1, 37.) Huber noted Master's history of drug abuse, and noted that the treatment goal "is not to induce or reinforce an addiction potential." (App. 1, 37.) Huber also noted concerns that Masters needed further consultation from the psychology department about drug addiction. Huber explained that he "assured patient that headaches don't kill [by reviewing with Masters] the MRI that showed no tumor or defects." (App. 1, 39.) Huber opined that there was no medical reason why Masters could not work, and that it actually might benefit him by helping him keep his mind on other tasks. (Ap. 1, 37,38.)

On December 15, 21, 23, and 30, 2005, Masters was provided Toradol for his headaches. (App. 1, 40-41.) Huber examined Masters on January 17, 2006, and again noted the need to give Masters a work assignment, and again prescribed Toradol to be given no more than twice a week, but wrote the prescription for 90 days. (App. 1,

44.) Upon receipt of the January 17, 2006, Toradol prescription, pharmacist Arden Hanson noted that the manufacturer of Toradol limited prescriptions to one a week. (*Id.*) The BOP's formulary also limits prescriptions of Toradol to a one-week period. (Hanson Decl., 60.) Because of that, Hanson declined to fill the prescription as written, and instead limited the prescription to apply only for one week. (*Id.*) Hanson did so, not because use of Toradol beyond one week would be inappropriate, but because, due to the side effects of too much Toradol, the medical staff should examine Masters and then prescribe Toradol as needed, rather than giving him a standing prescription. (*Id.* at 60-61.) After this prescription change, Masters was provided Toradol on several occasions after being evaluated. (App. 1, 45-48.)

In the psychologist's notes resulting from the review called for by Huber on December 13, 2005, a psychology intern named Jay Munneke noted that Masters had "produced an invalid profile [on his objective personality testing] that suggested efforts to exaggerate or feign the severity of his mental illness." (App. 1, 50-51.) Later in April 2006, the same psychology department employee noted that "[b]ased on the results of diagnostic testing, behavioral observations, and telephone monitoring, the [psychology] team concluded that a formal Axis I diagnosis was not warranted." (App. 1, 52-53.) Further, on May 23, 2006, he noted that Masters did not "appear to meet . . . diagnostic criteria for [post-traumatic

stress disorder]," but had a diagnosis of Methamphetamine-Induced Anxiety Disorder, with generalized anxiety, and a provisional diagnosis of antisocial personality disorder. (App. 1, 57.)

*Analysis--Dr. Huber*

Defendant Huber seeks summary judgment on the basis that he is entitled to qualified immunity from Plaintiff's claim of deliberate indifference to his serious medical needs. Qualified immunity protects government officials performing discretionary functions from personal liability as long as their conduct violates no clearly established constitutional or federal statutory rights.[11] To overcome such an official's immunity from suit, a plaintiff must allege the violation of a right so apparent or so obvious that a reasonable official would understand that what he is doing violates that right.[12] When a defendant pleads qualified immunity, as Huber has done, the Court must initially determine whether the plaintiff has asserted a violation of a constitutional or statutory right at all.[13] This is the first prong of a two-prong test. The Court need go no further if the plaintiff has failed to produce evidence that the defendant violated a constitutional or federal statutory

---

[11] *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Sorenson v. Ferrie,* 134 F.3d 325, 327 (5th Cir. 1998).

[12] *See Anderson v. Creighton,* 483 U.S. 635, 640 (1987).

[13] *See Saucier v. Katz,* 533 U.S. 194, 201 (2001).

9

right.[14] If a violation is shown, the Court must reach the second prong, which involves essentially two separate inquiries: whether the allegedly violated right was "clearly established" at the time of the incident;[15] and, if so, whether a reasonable government official in the defendant's situation would have understood that his conduct violated that right.[16] Huber challenges each of Masters's allegations as failing to state a violation of a constitutional right.

Masters asserts four distinct allegations against Dr. Huber arising from the medical care he received under Huber's direction, and alleges them as a claim of a violation of his right to be free from cruel and unusual punishment under the Eighth Amendment. First, Masters complains that Huber accused him of "faking" his complaints because Masters was an addict "looking for a fix."[17] (Compl. at 4, 7: MDS at 2,5 and 9.) Second, Masters complains that Huber "refused to give [him] the medication in which the neuro [sic] consultant had proscribed [sic]" and instead sent him to learn pain management techniques. (MDS at 4,9; Compl. at 5.) Third,

---

[14]See *Hassan v. Lubbock Indep. Sch. Dist.,* 55 F.3d 1075, 1079 (5th Cir.), *cert. denied,* 516 U.S. 995 (1995).

[15]See *Saucier,* 533 U.S. at 202.

[16]See *Anderson,* 483 U.S. at 641.

[17]To the extent this allegation can be read to stand alone as an allegation that Huber's statements amounted to a slander of him, such claim does not state a constitutional violation. See *Geter v. Fortenberry,* 849 F.2d 1550, 1556 (5th Cir. 1988), *citing Paul v. Davis,* 424 U.S. 693 (1976).

10

Masters complains that Huber "still tried to put [him] to work, knowing [his medical] condition." (MDS at 5,9.) Finally, Masters complains that Huber "prescribed a non-injectable medication that the pharmacist Hanson refused to fill, because he states it would 'Kill Masters' the way it was prescribed, because it would cause him to bleed internally." (MDS at 9.)

The government has a constitutional obligation to provide medical care for those it punishes with incarceration. In fact, the Eighth Amendment to the United States Constitution proscribes deliberate indifference to serious medical needs of prisoners, which may involve, among other things, the "unnecessary and wanton infliction of pain."[18] In considering the first part of the qualified-immunity analysis, in order to make out a claim of deliberate indifference, a plaintiff must demonstrate that the defendant official has actual subjective knowledge of a substantial risk of serious harm, but responds with deliberate indifference to that risk.[19] Such a finding of deliberate indifference, though, "must rest on facts clearly evincing 'wanton' actions on the parts of the defendants."[20] This subjective deliberate-indifference standard is now equated with the standard for criminal

---

[18] *See Estelle v. Gamble,* 429 U.S. 97, 103-04 (1976).

[19] *See Hare v. City of Corinth,* 74 F.3d 633, 648 (5th Cir. 1996), *appeal after subsequent remand,* 135 F.3d 320, 327 (5th Cir. 1998).

[20] *Johnson v. Treen,* 759 F.2d 1236, 1238 (5th Cir. 1985); *see also Wilson v. Seiter,* 501 U.S. 294, 297 (1991).

11

recklessness:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference.[21]

Allegations of negligence are not sufficient to maintain an action under 42 U.S.C. § 1983.[22] A disagreement of opinion as to the correct medication and/or medical treatment does not constitute an actionable civil-rights claim, but at most, a possible claim of medical malpractice addressed under state law.[23] In *Domino v. Texas Department of Criminal Justice,* the Fifth Circuit discussed the extremely high standard a plaintiff must meet to state a claim for deliberate indifference to serious medical needs:

> It is indisputable that an incorrect diagnosis by medical personnel does not suffice to state a claim for deliberate indifference. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir.1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* Furthermore the decision whether to provide additional treatment "is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. And, the "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show

---

[21]*Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *see also Hare,* 74 F.3d at 648.

[22]*See, e.g., Daniels v. Williams,* 474 U.S. 327, 332 (1986) (concluding that the Constitution "is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property").

[23]*See Estelle,* 429 U.S. at 107; *Norton v. Dimazana,* 122 F.3d 286, 292 (5th Cir. 1997); *Varnado v. Lynaugh,* 920 F.2d 320,321 (5th Cir. 1991).

deliberate indifference. *Farmer,* 511 U.S. at 838.[24]

As noted by Huber in his motion and brief in support, with regard to Masters's first three allegations, the medical records recounted in the facts above show that Huber actively treated Masters's headaches. With regard to Huber's recommendation that Masters should attempt to work, this was included as a part of Huber's medical judgment that work activities might actually benefit Masters by helping keep his mind on other tasks. Thus the work recommendation could not be said to be indifferent. With regard to the adequacy-of-care allegations, on different occasions, Huber tried or continued many different medications, including Elavil, Atenolol, Keppra, Tylenol, Toradol; he recommended pain management; he referred Masters for neurological consultation; and he referred Masters for psychological review and counseling. Masters's complaints that these medications did not work to the extent he desired, and that the use of narcotic drugs was necessary, does not negate the evidence that Masters was constantly being medically treated for his headache condition. Though Masters may have preferred narcotic medications, and while a neurologist suggested that Huber might "consider" narcotics, Masters's preference does not establish that Huber was deliberately indifferent in attempting to find a route of pain management for a chronic, refactory condition that did not include narcotics, especially in light of Huber's concern regarding Masters's past

---

[24]239 F.3d 752, 756 (5th Cir.2001).

drug use. Rather, the facts demonstrate that Huber was exercising his medical judgment in determining the best method of treatment for Masters. Masters's first three allegations "suggest nothing more than a difference of opinion as to the appropriate method of treatment under the circumstances"[25] and thus, do not rise to the level of deliberate indifference.

Masters's fourth allegation, that Huber prescribed a medication that the pharmacist refused to fill because it would kill him, fails to state a constitutional violation upon review of the overall factual record. As noted, Huber authorized Toradol for usage no more than twice a week, but for an ongoing 90 days. Pharmacist Hanson noted that he was not hesitant to fill the prescription because its use beyond one week might not be appropriate or because it might kill Masters, but rather due to the medication's side effects. Thus, Hanson explained that the problem was having the standing prescription order, rather than requiring Masters to be evaluated before each new prescription for Toradol. (Hanson Decl. at 61.) Although Masters's fourth allegation does raise a question of medical judgment or negligence as to whether Huber should have known and followed the BOP formulary in providing the prescription, it does not state a claim that Huber was deliberately indifferent to Masters's serious medial needs.[26]

---

[25]*Stewart v. Murphy,* 174 F.3d 530, 535 (5th Cir.), *cert. den'd,* 528 U.S. 906 (1999).

[26]The Court notes that as a part of the Prison Litigation Reform Act, Congress placed a restriction on a prisoner's remedies unless there is a showing of physical injury: "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or

14

As Masters's allegations regarding his medical care under Dr. Huber allege nothing more than a disagreement over medical treatment, and a disagreement among treating physicians as to the proper course of treatment, he has not stated claims of deliberate indifference to support an allegation of a violation of the Eighth Amendment. As such, Dr. Huber is entitled to qualified immunity, and his motion for summary judgment must be granted.

*Analysis--USA*

The crux of Masters's claim against the United States is that BOP officials and prison staff physicians, including Dr. Huber, failed to follow the consulting physician's recommendation to include the use of narcotics in treatment of his headaches.(Compl. at 5-7; MDS at 3-8.)

The United States is immune from suit unless it consents to be sued, and the terms of such consent, or waiver of its sovereign immunity, "define [the] Court's jurisdiction to entertain the suit."[27] The Federal Tort Claims Act ("FTCA") contains a waiver of sovereign immunity.[28] The FTCA authorizes civil actions for damages against the United States for personal injury caused by the

---

emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C.A. 1997e(e)(West 2006). As the prescription complained of by Masters was not filled, there can be no physical injury resulting from Huber's writing of the prescription. Thus, for this alternative reason, Huber's fourth allegation based upon Huber's 90-day Toradol prescription must be denied.

[27]*United States v. Testan,* 424 U.S. 392, 399 (1976).

[28]*See* 28 U.S.C.A. § 1346(b)(West 2006); 28 U.S.C.A. § 2674 (West 2006).

negligence of government employees when private individuals would be liable under the substantive law of the state in which the negligent acts occurred.[29] In this case the Court applies Texas law. Texas law authorizes suits for medical malpractice when the plaintiff can prove: (1) a duty by the physician or hospital to act according to an applicable standard of care, (2) a breach of that standard of care, (3) an injury, and (4) a causal connection between the breach of care and the injury.[30] The standard of care is a threshold issue that the Plaintiff must establish before turning to whether the defendant breached such standard.[31]

Generally, expert testimony is required to prove, or as required here, raise an issue as to the applicable standard of care.[32] Such testimony must set forth the standard of care in the community in which the treatment took place or in similar communities.[33] The burden is on the plaintiff to establish that the defendant provided a mode of treatment that "a reasonable and prudent member of the medical profession would not have undertaken

---

[29]*Id*; 28 U.S.C.A. § 2674 (West 2006); *see also Quijano v. United States,* 325 F.3d 564, 567 (5th Cir.2003).

[30]*See Hannah v. United States,* 523 F.3d 597, 601 (5th Cir. 2008)(citing *Quijano,* 325 F.3d at 567); *see also Denton Reg. Med. Ctr. V. LaCroix,* 947 S.W. 2d 941, 950 (Tex.App.-Fort Worth 1997, no pet.)

[31]*Hannah,* 523 F.3d at 601 (citing *Quijano,* 325 F.3d at 567 (citations omitted)).

[32]*Quijano,* 325 F.3d at 567 (citing *Hood v. Phillips,* 554 S.W. 2d 160, 165-66 (Tex. 1977)); *see also Bowles v. Bourdon,* 148 Tex. 1. 219 S.W.2d 779, 782 (1949).

[33]*Id* (citing *Birchfield v. Texarkana Mem'l Hosp.,* 747 S.W.2d 361, 366 (Tex. 1987)); *Hall v. Huff,* 957 S.W. 2d 90, 101 (Tex.App.-Texarkana 1997, pet. den'd).

under the same or similar circumstances."[34] Unless the form of treatment is a matter of common knowledge, or is within the experience of a layman, expert testimony is required.[35]

But Masters has failed to designate an expert and provide information from such expert regarding the standard of care. The record evidence shows that Masters was seen, evaluated, and treated for his migraine-headache condition by a bevy of medical personnel and that an assortment of medications and treatment protocols were employed. What the appropriate standard of care is, and whether Masters's treatment comported with that standard of care is not a matter of common knowledge, nor is it within the experience of a layman. Thus, under applicable Texas law, expert testimony is required for Masters to meet his burden of proof.

Masters seeks an extension of time to obtain expert testimony. He does so on the contention that he could obtain the testimony of both a consulting psychiatrist and neurologist involved in his treatment. But Masters, who proceeds pro-se and in-forma-pauperis under 28 U.S.C. § 1915 in this case, has not shown how he could pay the costs associated with providing the witness fees necessary to obtain these persons' presence at trial.[36]

---

[34] *Hood,* 554 S.W.2d at 165.

[35] *Id.* at 165-66.

[36] *See Hannah,* 523 F.3d at 601 (quoting *Pedraza v.Jones,* 71 F.3d 194, 196 (5th Cir. 1995)("the plain language of [28 U.S.C. § 1915] does not provide for the appointment of expert witnesses to aid an indigent litigant")) *see also Walton v. Yates,* No.3:94-CV-2007-D, 1996 WL 734953, at *1 (N.D.Tex. Dec. 10, 1996)(since plaintiff had not tendered witness fees or mileage fees for person to be subpoenaed, he was not entitled to have them served).

In his pleadings, Masters refers to 18 U.S.C. § 4042, which imposes on the Bureau of Prisons the duties to "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons convicted of offenses against the United States" and to "provide for the protection . . . of all persons . . . convicted" of such offenses.[37] To the extent that Masters's citation to this statute could be read as a claim that it creates a duty of care sufficient to support liability in a medical malpractice case, the Court rejects such claim.[38] Thus, the general duty enunciated in 18 U.S.C. § 4042 does not set forth the standard of care for a particular medical negligence claim, and Masters cannot rely upon that statute to avoid the obligation to provide expert testimony to meet his burden.

Thus, as Masters has failed to provide expert testimony, he cannot create a material fact issue on the standard of care to support his claims under the FTCA, and the motion for summary judgment of the United States thus must be granted.[39]

---

[37] 18 U.S.C.A. § 4042(a)(2) and (3)(West 2000).

[38] *See United Scottish Ins. Co., v. United States,* 614 F.2d 188, 198 n. 9 (9th Cir. 1979)(citing *United States v. Muniz,* 374 U.S. 150, 153 (1963); *see also Brown v. United States of America,,* No.99-C-0400-C, 2000 WL 34235983 at *3 (W.D. Wis. Aug. 18, 2000).

[39] This court previously denied Masters's request for a preliminary injunction. Although Masters cited in his complaint the Administrative Procedures Act ("APA"), 5 U.S.C. § 702 (West 2007), et seq., he has not otherwise sought equitable relief, and thus this Court is without jurisdiction. *See generally Armendariz-Mata v. U.S. Dept. Of Justice, et al.,* 82 F.3d 679,682 (5th Cir. 1996)(noting that although 5 U.S.C.§ 702 authorizes a claim against the United States for other than money damages, when the substance of the complaint is for monetary damages, the case is not covered by § 702 and sovereign immunity is not waived). Thus, any claim by Masters under the APA against the United States is dismissed.

*ORDER*

Masters's second motion for extension of time [docket no. 44] is GRANTED, with the effect that Masters's August 1, 2008, response to the motion for summary judgment of the United States is timely.

Dr. Huber's January 14, 2008, motion for summary judgment [docket no. 26] is GRANTED.

The June 10, 2008, motion for summary judgment of defendant United States [docket no. 36] is GRANTED.

Plaintiff shall take nothing on his remaining claims against defendants Dr. Huber and the United States of America and such claims are DISMISSED WITH PREJUDICE.

SIGNED September 9, 2008.

*[signature: Terry R. Means]*
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE